TRINA BOUDOIN ET AL                        CIVIL ACTION

VERSUS                                     NO: 07-6842

ST. CHARLES PARISH HOSPITAL                SECTION: J(3)
ET AL

## ORDER AND REASONS

Before the Court are the **Motion to Dismiss, or in the Alternative Motion for Summary Judgment (Rec. Doc. 39)** filed by Defendant Greg Champagne in his capacity as Sheriff of St. Charles Parish ("Champagne"), and the **Motion for Summary Judgment (Rec. Doc. 40)** filed by Defendant Brian Brogle, M.D., in his capacity as Coroner of the St. Charles Parish Coroner's Office ("Brogle").  These motions seek dismissal of Plaintiff's claims under 42 U.S.C. § 1983 and supplemental claims under Louisiana law arising out of the wrongful death of her son due to the alleged violation of his rights under the Fourteenth Amendment of the United States Constitution.  After review of the record, the memoranda of counsel, and the applicable law, the Court finds that Champagne and Brogle's motions should be granted as follows.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

Plaintiff's claims in this case arise out of the tragic drowning death of her seventeen-year-old son Ryshad Drake on January 30, 2007.  Ryshad arrived at West St. John High School on

the morning of January 30 wearing house slippers and non-uniform clothing, and exhibiting other abnormal behavior.  He was taken to the principal's office, where Elton Oubre, the principal, and Grant Pierre, the school resource officer and St. John the Baptist Sheriff's officer, determined that Ryshad was suffering a psychiatric and/or psychotic disturbance.  An ambulance was called to transport Ryshad to St. Charles Parish Hospital, and while awaiting its arrival, Ryshad had to be handcuffed and restrained in the office to prevent his escape.  Additionally, when the ambulance arrived, Ryshad had to be physically subdued in order to be placed on the stretcher.

After arriving at the hospital, Ryshad was placed in a regular emergency room bed without restraint.  Nurse Mark Fontenelle began to perform preliminary tests on Ryshad, who admitted to smoking marijuana and taking ecstacy earlier that morning.  Fontenelle testified that initially Ryshad was calm and cooperative during the testing.  However, when Fontenelle attempted to insert an I.V. into Ryshad's arm, Ryshad became agitated and ran out of the hospital in his boxer shorts and hospital gown.  At this time, one of the staff doctors at the hospital informed Plaintiff that she should obtain an order of protection ("Commitment Order") from the coroner's office, which is located in St. Charles Parish Hospital.  However, when Plaintiff attempted to obtain the Commitment Order, she was

allegedly informed by the Nancy Pollard, the coroner's assistant, that the order could not be issued because she and her son were residents of St. John the Baptist Parish and not St. Charles Parish.

In the meantime, St. Charles Parish sheriff's officers had been notified of Ryshad's flight from the hospital. The initial dispatch call, according to one of the officers involved, indicated that a black male subject had fled the emergency room, and that he might be a danger to himself because he had an I.V. in his arm when he fled. Ryshad eventually ran into an area known as Ashton Plantation. Three different officers, Ken Doody, David Hitzman, and Nicholas Monk, were all involved in the pursuit/observation of Ryshad's flight. Doody pursued Ryshad for approximately 10-15 minute in his vehicle. At one point, Doody exited his vehicle to attempt to stop Ryshad and radioed for backup to the Ashton Plantation area, but never apprehended or physically engaged Ryshad. Hitzman likewise responded in his vehicle, and after seeing Ryshad only once from about an eighth of a mile away, drove to an area where he could exit his vehicle and access the section of Ashton Plantation where he had seen Ryshad walking. Officer Monk, who was also in his vehicle reporting to the area, witnessed Ryshad running across a portion of Ashton Plantation and began to follow. In the end, Ryshad entered a pond on the Ashton Plantation property where he

drowned.  Several construction workers in the area told the
officers that they had seen Ryshad walk into the pond and go
under without resurfacing.

## THE PARTIES' ARGUMENTS

### A.  Champagne's Motion to Dismiss/Summary Judgment[1]

As an initial matter, Champagne notes that Plaintiff has not
alleged his personal involvement in the events leading to the
death of her son.  Thus, Champagne argues that Plaintiff's §1983
claims against him can only proceed under a theory that his
policies or customs as sheriff of St. Charles Parish led to the
alleged deprivation of Ryshad's Fourteenth Amendment rights.
Champagne asserts very simply that Plaintiff has not presented
any evidence regarding any such policy or custom, and thus he is
entitled to judgment as a matter of law on Plaintiff's §1983
claims.

In addition, even if Champagne and any of his deputies might
be liable under §1983, Champagne asserts that they are entitled
to qualified immunity as a matter of discretionary function.
Champagne argues that government officials are entitled to
immunity in the performance of their duties as long as their

---

[1]  While Champagne proposes that his motion should be
treated as a motion under Rule 56 since it was filed after his
answer, this "is a thoroughly incorrect statement of the law."
Meredith v. Nowak, 2008 WL 4808905, *2 (E.D. La. Oct. 31, 2008).
Nonetheless, because Champagne's motion relies on evidence
outside of the pleadings, it should be treated as a Rule 56
motion.

conduct does not violate clearly established statutory or constitutional rights that a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity analysis requires a two-step inquiry: 1) whether the plaintiff has alleged the violation of a clearly established federal constitutional or statutory right; and 2) whether the defendants' conduct was objectively reasonable in light of the clearly established law regarding that right. Hare v. City of Corinth, 135 F.3d 320, 325-26 (5th Cir. 1998).

As for the first prong of the qualified immunity inquiry, Champagne argues that Plaintiff has not alleged the violation of her son's substantive due process rights because a state actor does not have a duty to protect an individual against private violence under the Fourteenth Amendment unless the person is in state custody. Deshaney v. Winnebago County Soc. Servs. Dept., 489 U.S. 189 (1989). As such, Champagne argues that neither he nor his officers had any duty to protect Ryshad from his suicidal acts, and thus no violation of his substantive due process rights occurred. Furthermore, Champagne argues that the "state-created danger" exception to the Deshaney rule is not applicable in the Fifth Circuit.

Additionally, even if Plaintiff can establish the violation of some constitutional right in the events surrounding her son's death, Champagne argues that he is entitled to qualified immunity

under the second prong because any such violation was *not objectively contrary* to clearly established law.  Thus, even if the "state-created danger" exception were applicable in the Fifth Circuit, that exception is not sufficiently defined and circumscribed to constitute clearly established law. Furthermore, even if the "state-created danger" exception were applicable as clearly established law, Champagne argues that the actions of the three officers were objectively reasonable in the circumstances because they were not able to physically apprehend Ryshad before he entered the pond.  Importantly, Champagne contends that none of the three pursuing officers had any reason to believe that Ryshad was suicidal because they had no prior experience with Ryshad's behavior and history.

Finally, Champagne argues that because he is entitled to summary judgment on Plaintiff's §1983 claims according to the arguments outlined above, Plaintiff's state law supplemental claims should also be dismissed, either for lack of jurisdiction or for lack of evidence to support her claims.

**B.   Brogle's Motion for Summary Judgment**

Brogle seeks summary judgment of Plaintiff's claims under the tort articles in the Louisiana Civil Code and under 42 U.S.C. §1983.   Brogle initially argues that Plaintiff's claims against him are untenable as a matter of causation.  Specifically, Brogle notes that Plaintiff came into the coroner's officer to request

the Commitment Order at approximately 10:05 a.m. on January 30, 2007. However, Ryshad drowned in the pond at approximately 10:06 a.m. on the same day. As a result, Brogle argues that there is no possible way that the alleged improper refusal to issue the Commitment Order was a cause in fact of Ryshad's death. In other words, Brogle argues that the statutory requirements for issuance of an order of commitment would necessarily have taken more than the approximate one minute interval between Plaintiff's request for the order and Ryshad's death. See La. Child. Code Ann. art. 1432; La. Rev. Stat. Ann. §28:53.2. Thus, because the order could not have been issued prior to Ryshad's drowning, any alleged improper conduct by Brogle's office in refusing the order could not have been a cause in fact of Ryshad's death. In addition, Brogle points to Plaintiff's own deposition testimony, in which she admitted that she believed the St. Charles Parish sheriff's deputies would apprehend her son despite the lack of a commitment order. Brogle argues that this testimony reveals that Plaintiff herself understood that the lack of a commitment order would have no effect on the apprehension or protection of her son. Based on this evidence disproving causation, Brogle contends that Plaintiff's claims fail as a matter of law.

In addition, Brogle argues that Plaintiff's claims fail as a matter of law because no commitment order could have been issued on the facts of this case under the governing statutes.

7

Specifically, Brogle notes that both the Children's Code

provision and the Louisiana Revised Statutes provision governing

issuance of commitment orders require a statement that the person

for whom commitment is requested is mentally ill or suffering

from substance abuse and is in need of immediate treatment to

protect himself or others from harm.  See La. Child. Code Ann.

art. 1432; La. Rev. Stat. Ann. §28:53.2.  Brogle contends that

Plaintiff's own deposition testimony, which indicated that Ryshad

had never before used drugs or suffered from psychiatric

problems, as well as the testimony of nurse Fontanelle that

Ryshad was not presenting apparent symptoms of mental illness,

both reveal that a commitment order would not have been

appropriate.  Brogle also cites the Louisiana Second Circuit

Court of Appeal decision in <u>Jones v. Gaines</u>, in which the

plaintiff parents sued for the wrongful death of their

schizophrenic son after he was released from a state hospital and

died in a car accident.  978 So.2d 522 (La. App. 2 Cir. 2008).

The <u>Gaines</u> court held that the state defendants were not liable

for the son's death because they did not have a duty to withhold

the son's keys and because his death was too remote in the chain

of causation.  See also <u>Todd v. State through Dept. of Soc.</u>

<u>Servs., Office of Cmty. Servs.</u>, 699 So.2d 35 (La. 1997) (denying

wrongful death claim against state department of social services

and case worker for alleged negligence in causing child's suicide

8

by removing him from abusive mother's custody and failing to provide adequate protective custody).

Finally, Brogle argues that Plaintiff's Fourteenth Amendment claims fail as a matter of law because she has not alleged sufficient facts for the required finding of deliberate indifference, which is defined as "subjective recklessness as used in criminal law," to support her claims based on violation of her son's Fourteenth Amendment rights. <u>Busby v. Thompson</u>, 2008 WL 2942133 (N.D. Miss. July 28, 2008). Furthermore, Brogle argues that Plaintiff's claims based on the non-issuance of the Commitment Order are self-defeating under the Fourteenth Amendment. Specifically, Brogle notes that Plaintiff's claims are based on the fact that his office *did not restrain Ryshad's liberty* under the relevant statutory provisions. Essentially, therefore, Brogle contends that Plaintiff seeks damages against him for *not* depriving Ryshad of his constitutional right to liberty and freedom from seizure of his person under the necessary due process provided by Louisiana law. According to Brogle, this claim would require a finding that Ryshad had a constitutional right to have his constitutional right to freedom abrogated without due process, which is a clear contradiction of terms.

### C.   Plaintiff's Opposition

9

**(1) Champagne's Motion[2]**

In response to Champagne's motion, Plaintiff contends that the three officers pursuing Ryshad knew that he was a danger to himself and did not take adequate measure to prevent his death. First, Plaintiff notes that Officer Hitzman testified that the dispatch call indicated that a black male had escaped from the St. Charles Parish Hospital and was a danger to himself. This testimony proves that the officers knew that Ryshad was in danger of harming himself. Additionally, Hitzman testified that he responded to the area of Ashton Plantation because he knew that Officer Doody was older and would not be able to give chase to Ryshad. Hitzman also testified that Sergeant Benoit announced on the radio that the officers should not apprehend Ryshad because he was not under arrest, and any apprehension would therefore violate the standing directive of the sheriff's office prohibiting pursuit of non-criminals. Nonetheless, Hitzman admitted that he could have arrested Ryshad for the crime of trespassing.

Plaintiff argues that all these admissions create material issues of fact that preclude summary judgment on her claims

_____

[2] It should be noted that although Plaintiff refers throughout her opposition to the conduct of officers Doody, Hitzman, and Monk, she has not asserted claims against any of those officers individually. Rather, her claims proceed solely against Champagne, who was not personally involved in the events of this case, as the Sheriff of St. Charles Parish.

against Champagne. Most importantly, Plaintiff notes that the relevant directive of the St. Charles Parish Sheriff's Office allows officers, based on reasonable grounds and their own observations, to take into custody any person that may be a subject for involuntary admission to a treatment facility because he is acting in a manner dangerous to himself. See Rec. Doc. 51-2, Ex. D. Based on this official protocol, as well as Officer Hitzman's admission that he was aware that Ryshad was a possible danger to himself, Plaintiff argues that there are questions of fact as to whether the officers under Champagne were improperly following a policy and custom of not apprehending persons who might harm themselves in accordance with the protocol. In addition, Plaintiff argues that Sergeant Benoit's radio order to not apprehend Ryshad resulted in a "state-created danger" because the continued pursuit without any intention of apprehending Ryshad caused him to continue fleeing. Thus, despite the fact that the Fifth Circuit has not conclusively recognized the "state-created danger" doctrine, and despite the fact that Champagne claims that no officers were ever close enough to apprehend Ryshad, Plaintiff contends that there are material issues of fact and questions of law that preclude summary judgment.

In addition, Plaintiff argues that Champagne's officers displayed deliberate indifference in failing to apprehend Ryshad

because they knew Ryshad might harm himself and still did nothing. As a result the officers were aware of facts leading to the inference that Ryshad might do substantial harm to himself, and also drew that inference subjectively. See <u>Smith v. Brenoettsy</u>, 158 F.3d 908, 912 (5th Cir. 1998).

Finally, Plaintiff argues that Champagne is not entitled to qualified immunity because his conduct was not objectively reasonable in light of clearly established law.

In addition, Plaintiff contends that her state law claims are viable independently from her §1983 claims based on Champagne's inappropriate policies and failure to properly train his officers for emergency mental health situations.

### (2) Brogle's Motion

In opposition to Brogle's motion, Plaintiff contends that the coroner's office acted with deliberate indifference in denying her request for the Commitment Order by informing her that she had to acquire such an order from St. John the Baptist Parish and by tearing up the application for the St. Charles Parish order in front of her. The deposition testimony of Brogle's assistant Nancy Pollard indicates that she did not even consult with Brogle regarding the commitment order requested for Ryshad until after Plaintiff left the hospital, and that Brogle then concurred in her denial of the order. Furthermore, Plaintiff contends that the time line on which Brogle relies for

support in his motion is based solely on the equivocal chronology testimony of Plaintiff that was induced by Brogle's attorney. Specifically, Plaintiff notes that despite her testimony that she could not remember the exact time of her request and that the request for the Commitment Order *was torn up* in front of her, an alleged version of the request has surfaced in discovery with a time stamp that coincides with Brogle's time line. Plaintiff argues that the very existence of this document in light of Plaintiff's testimony that it was destroyed before her eyes constitutes a question of material fact as to the timing of the request that preclude summary judgment. In addition, Plaintiff cites the affidavit testimony of Dr. Vela Boles, a medical examiner, that ten minutes would have been more than enough time for issuance of the Commitment Order.

Additionally, Plaintiff distinguishes the cases relied on by Brogle. First, she notes that the court in <u>Gaines</u> based its holding on the fact that the defendant hospital actually followed its own procedures in releasing the plaintiffs' schizophrenic son. Likewise, the Louisiana Supreme Court's decision in <u>Todd</u> was based on the fact that the investigation of abuse in that case was conducted according to department protocols and because the child had not previously exhibited any suicidal tendencies to the caseworker. Finally, Plaintiff argues that Brogle had a duty to and a special relationship with Ryshad, a mentally unstable

person, as a result of his position as coroner of St. Charles Parish.  As such, Plaintiff contends that Brogle had an affirmative duty under the statutes governing issuance of commitment orders to issue the order that might have protected Ryshad in this case.  As such, Plaintiff argues that Brogle's motion should be denied.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588 (1986).

### A.    42 U.S.C. §1983 and Qualified Immunity

To state a claim under § 1983, plaintiffs must allege two elements: first, that they were deprived of a right or interest secured by the Constitution and laws of the United States, and second, that the deprivation occurred under color of state law. <u>Doe v. Rains County Independent School Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995).  In addition, when a plaintiff makes claims under §1983 for infringement of rights guaranteed by the

14

Fourteenth Amendment, she must allege "state action," which for practical purposes is essentially the same as the "under color of state law" requirement under §1983. Id. As such, "in § 1983 suits alleging a violation of the Due Process Clause of the Fourteenth Amendment, [the Fifth Circuit has] collapsed the state action and color of state law inquiries into a single, second step: Plaintiffs must (1) assert a protected "liberty or property" interest and (2) show that they were deprived of that interest under color of state law." Id.

Even in the face of a properly pled claim under §1983, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Additionally, "[t]he doctrine of qualified immunity grants protected government officials immunity from suit, not simply a defense against liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Once a defendant properly invokes qualified immunity, the burden shifts to the plaintiff to show why the defense does not apply. O'Dwyer v. Nelson, 2009 WL 412462 (5th Cir. 2009). Furthermore, a state defendant will be entitled to qualified immunity as long as his or her conduct did not (1) violate a constitutional right that was (2) clearly established

at the time the alleged violation occurred.  Mesa v. Prejean, 543
F.3d 264, 269 (5th Cir.2008).  This two-prong inquiry was set out
in Saucier v. Katz, 533 U.S. 194, 201 (2001). Recently, the
Supreme Court modified the holding in Saucier to state that the
sequence of this inquiry is no longer mandatory, and that lower
courts may use their discretion in deciding whether to apply the
Saucier procedure. Pearson v. Callahan, 129 S. Ct. 808, 2009 WL
128768 (Jan. 21, 2009).  Thus, in analyzing the right to
qualified immunity, district courts are now free to determine, in
whichever order they choose, whether a plaintiff has met the
burden of showing that she has alleged an actual constitutional
violation or whether the right at issue is clearly established.
In this analysis, a court considers whether the allegedly
improper "actions of the officer [were] objectively reasonable
under the circumstances, such that a reasonably competent officer
would not have known his actions violated then-existing clearly
established law."  Mesa, 543 F.3d at 269 (internal quotations
omitted).

**B.    State-created Danger Doctrine**

Plaintiffs claims against Champagne proceed at least in part
under the "state-created danger" exception to the general rule
established by the Supreme Court's decision in DeShaney v.
Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197, which
held that state officials have no constitutional duty to protect

an individual from private violence.  Several courts have
interpreted the <u>DeShaney</u> opinion to establish that state
officials may have a duty to protect an individual from injuries
by a private party if the state actor played an affirmative role
in creating or exacerbating a dangerous situation that caused the
individual's injury.  See, e.g., <u>Butera v. District of Columbia</u>,
235 F.3d 637, 651 (D.C. Cir. 2001); <u>Kallstrom v. City of
Columbus</u>, 136 F.3d 1055, 1066-67 (6th Cir. 1998).

This "state-created danger" theory of §1983 liability has
charted a tortuous path in the Fifth Circuit, intermittently
recognized by panels of the court, only to be rejected by the en
banc court soon after.  See, e.g., <u>McClendon v. City of Columbia</u>,
258 F.3d 432, 436 (5th Cir. 2001) (expressly adopting the "state-
created danger" theory) *rev'd en banc*, 305 F.3d 314 (5th Cir.
2002) (finding that the "state-created danger" theory did not
create a clearly established constitutional right sufficient to
defeat a qualified immunity defense to plaintiff's §1983 claim);
<u>Breen v. Texas A&M Univ.</u>, 485 F.3d 325, 331-38 (5th Cir. 2007)
(recognizing validity of "state-created danger" theory under law-
of-the-case doctrine) *relevant sections of opinion withdrawn by*
<u>Breen v. Texas A&M Univ.</u>, 494 F.3d 516 (5th Cir. 2007 (per
curiam).  In fact, three dissenting judges in <u>McClendon</u> lamented
the Fifth Circuit's historical "methodological approach-assuming
arguendo for the purposes of each case that the state-created

17

danger theory is a valid one but never explicitly rejecting or adopting it" and pointed out that the ad hoc treatment of the theory "cannot be defended and leaves this area of circuit law in a perpetual state of confusion."  305 F.3d at 334 (Parker, J., Wiener, J., and DeMoss, J., dissenting).

Nonetheless, as noted by the majority in <u>McClendon</u>, the Fifth Circuit "has frequently spoken of the 'state-created danger' theory, and has discussed its various permutations and requirements as applied in other circuits, but neither the Supreme Court nor this court has ever either adopted the state-created danger theory or sustained a recovery on the basis thereof."  <u>Rios v. City of Del Rio, Tex.</u>, 444 F.3d 417, 422 (5th Cir. 2006) (citing <u>McClendon</u>, 305 F.3d at 330-32).  As a result, the "state-created danger" doctrine remains inapplicable in the Fifth Circuit, despite the admittedly confusing hodgepodge of decisions on the issue.  See, e.g., <u>Beltran v. City of El Paso</u>, 367 F.3d 299, 307 (5th Cir.2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1093 liability"); <u>Rivera v. Houston Independent School District</u>, 349 F.3d 244, 249 (5th Cir.2003) ("We have never recognized state-created danger as a trigger of State affirmative duties under the Due Process clause"); <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 584 (5th Cir.2001) ("Although this court has discussed the contours of the 'state-created danger' theory on

18

several occasions, we have never adopted that theory"). Furthermore, the McClendon court noted that although several circuits have adopted the theory, they are not all in agreement as to the parameters and nature of the right to be free from "state-created dangers." 305 F.3d at 331 (noting that "even those courts accepting the theoretical validity of the state-created danger doctrine admitted uncertainty as to its contours"). In the end, the "state-created danger" doctrine did not constitute a clearly established constitutional right in 1993, which was the period of time during which the conduct at issue in McClendon took place. Id. at 332-33. Furthermore, as recently as 2006, the Fifth Circuit has relied on McClendon to hold that the "state-created danger" doctrine still does not give rise to a clearly established constitutional right in the context of conduct occurring in 2003. Modica v. Taylor, 465 F.3d 174, 188 (5th Cir. 2006). Therefore, under the current controlling law in this circuit, state officials claiming qualified immunity in the context of claims based solely on the "state-created danger" theory under §1983 will be entitled to the immunity *as a matter of law*. See Barron v. Dallas County, 2004 WL 690836 at *4 (N.D. Tex. Mar. 30, 2004).

Nonetheless, the Fifth Circuit acknowledges that the en banc decision in McClendon "neither adopted nor rejected the state-created danger theory . . . [and simply made] clear . . . that at

the time of the events in <u>McClendon</u>, a state-created danger
theory was not clearly established . . . such as would sustain a
§1983 claim." <u>McKinney v. Irving Indep. Sch. Dist.</u>, 309 F.3d
308, 313 (5th Cir. 2002). As a result, several Fifth Circuit
courts have surreptitiously applied the "state-created danger"
doctrine while simultaneously recognizing its inapplicability,
and others have expressly accepted and applied the doctrine.
See, e.g., <u>Padilla v. United States</u>, 2007 WL 2409792 at *19 (W.D.
Tex. Aug. 20, 2007) (accepting and applying the "state-created
danger" doctrine as viable Fifth Circuit law in the wake of the
<u>Breen</u> decision); <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 584
(5th Cir. 2001) (refusing to adopt the "state-created Danger"
doctrine, but nonetheless applying the doctrine to show its
inapplicability). In either situation, Fifth Circuit courts have
agreed that, to the extent a "state-created danger" case may be
viable, three necessary elements must be alleged: (1) state
actors created a dangerous environment; (2) they know it is
dangerous; and (3) they "used their authority to create an
opportunity that would not otherwise have existed for the third
party's crime to occur." <u>Doe v. San Antonio Indep. School
Dist.-Bexas County</u>,2005 WL 544705 at *4 (W.D. Tex. Mar. 3, 2005)
(citing <u>Piotrowski</u>, 237 F.3d at 585). Stated differently, a
plaintiff in a "state-created danger" claim must show that her
harm resulted because "(1) the defendant's actions created or

20

increased the danger to the plaintiff; and (2) the defendant acted with deliberate indifference toward the plaintiff." Padilla, 2007 WL 2409792 at *19. In the end, "[t]he key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." Piotrowski, 237 F.3d at 585 (citing Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 201 (5th Cir. 1994)).

### C. Plaintiff's Claims in this Case

### (1) Claims against Champagne

Plaintiff's claims against Champagne are apparently based on two theories. First, Plaintiff asserts that the failure of Champagne's officers to follow his office's protocol allowing for arrest of mentally ill and suicidal persons, as well as the order from Sergeant Benoit in contravention of that protocol expressly prohibiting such an arrest, prevented the officers from helping Ryshad and caused him to drown. Second, Plaintiff alleges that the pursuit of Ryshad without any intent or attempt to physically apprehend him constituted a "state-created danger" that drove him to drown himself. Plaintiff's claims against Champagne fail on both fronts.

First, Plaintiff's claims based on the alleged failure to

follow internal protocols and/or the improper orders from Sergeant Benoit fail as a matter of law. "In general, local governments are under no duty to provide protective services: '[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" Piotrowski, 273 F.3d at 583 (quoting Deshaney, 489 U.S. at 196-97. As a result, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause [of the Fourteenth Amendment]." Id. In this case, neither Champagne nor his officers had any affirmative duty to protect Ryshad from his own suicidal intentions under the rule of Deshaney. To the extent that Plaintiff argues that the officers should have *deprived* Ryshad of his physical liberty in order to *preserve* the security of his life, the argument suggests precisely the internally conflicted duty that DeShaney sought to avoid.

Furthermore, Plaintiff has not presented conclusive evidence that the officers involved in this case even knew that Ryshad was suicidal during the pursuit. Plaintiff's own testimony revealed that Ryshad had never exhibited any prior mental instability, drug abuse problems, behavioral issues, or suicidal tendencies. See Rec. Doc. 40-3, Ex. B. 12-16. Furthermore, the only record

evidence that even suggests that any of the pursuing officers knew that Ryshad might be a danger to himself is the deposition testimony of Hitzman, which is itself equivocal at best on this issue.[3]  In addition, Doody testified that he had no knowledge whatsoever of the nature of Ryshad's treatment at the hospital or his behavior prior to fleeing, and further noted that although Ryshad was fleeing, he was not endangering himself or others in his flight.  See Rec. Doc. 39-5, Ex. A, Deposition of Deputy Kenneth Doody at 63,72-73.  Thus, there is no evidence that the pursuing officers even knew that Ryshad might be a danger to himself.  As a result, even if the officers had been following the protocol of the St. Charles Sheriff's Department, they still would not have acted any differently because they had no objectively reasonable grounds on which to arrest Ryshad as a danger to himself.  Therefore, as a matter of law under <u>Deshaney</u> and as a matter of fact on the present summary judgment record, Champagne is entitled to summary judgment on Plaintiff's claims based on the officers' allegedly improper failure to arrest Ryshad.

In addition, and even if Plaintiff's claims based on the

---

[3]  Specifically, Hitzman testified that the dispatch call he received indicated "that there was a black male subject who ran out of the emergency room against their judgment, and they warned that **he was a danger to himself or implied that he was a danger to himself due to the fact that he had an I.V. in his arm when he ran out**."  Rec. Doc. 51-3, at 44-45 (emphasis added).

failure to arrest Ryshad were viable, Champagne is entitled to qualified immunity with respect to those claims. Given the uncertain nature of Ryshad's condition, as well as the resounding rule in DeShaney that public officers have no duty to protect individuals from private violence, Champagne's and his officers' actions were "objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." Mesa, 543 F.3d at 269. Plaintiff has not met the burden of refuting Champagne's qualified immunity, and Champagne's motion should be granted on qualified immunity grounds as well.

Furthermore, Plaintiff's claims based on the "state-created danger" doctrine are untenable as a matter of law because the doctrine is not applicable in the Fifth Circuit. Furthermore, to the extent that the doctrine may be applicable, it is certainly not a clearly established constitutional right in light of the Fifth Circuit's inconsistent and sometimes conflicted treatment of the doctrine over the last twenty years. As a result, and to the extent that the "state-created danger" doctrine might be applicable to this case, Champagne is entitled to qualified immunity.

Finally, even if the "state-created danger" doctrine were a valid theory in the Fifth Circuit, Plaintiff's claims fail the prima facie requirements of a "state-created danger" claim under

the Fifth Circuit's various *sub rosa* applications of the
doctrine. Specifically, Plaintiff has not alleged nor presented
any evidence to support that Champagne or his officers acted with
"culpable knowledge and conduct in affirmatively placing [Ryshad]
in a position of danger, effectively stripping [him] of [his]
ability to defend [himself], or cutting off potential sources of
private aid." Piotrowski, 237 F.3d at 585. To the contrary, the
St. Charles Parish sheriffs were *actively trying* to stop Ryshad
from continuing to flee. Doody testified that he called out to
Ryshad on two occasions to stop so that he could call an
ambulance, but never had an opportunity to actually stop Ryshad.
Doc. 39-5, Ex. A Deposition of Deputy Kenneth Doody at 72. Thus,
not only did the officers not knowingly or culpably create the
opportunity for or place Ryshad in danger of drowning, they were
in fact attempting to stop him from running towards the pond so
that he could be brought back to the hospital for treatment. The
officers did not exhibit deliberate indifference in their pursuit
of Ryshad, and Plaintiff has not presented any facts to suggest
that the officers failure to follow the internal protocol created
an opportunity for Ryshad to drown that would not have otherwise
existed. See McKinney, 309 F.3d at 314 (holding that plaintiffs
did not present sufficient evidence to show that defendants'
failure to take a specific action actually caused or created the
dangerous situation at issue). In fact, it is unclear how the

officers' actions as presented on this summary judgment record
differed at all from the internal protocol. Although Plaintiff
alleges and the evidence suggests that the officers did not
attempt to *arrest* Ryshad, they were nonetheless engaged in
pursuing him and even made attempts to stop him, if not actually
arrest him. As a result, it is unclear how following the
internal protocol for arrests of suicidal persons, which would
itself require pursuit and apprehension of the individual as the
officers were attempting, would in any way have changed the
admittedly horrific outcome of this case. Thus, even if the
"state-created danger" doctrine were a valid basis for
Plaintiff's claims, she has neither alleged facts nor presented
refuting summary judgment evidence to support such a claim under
Fifth Circuit law.

The above analysis is consistent with the Fifth Circuit's
opinion in the analogous case of <u>Martin v. City of League City</u>,
in which the court affirmed the Rule 12(b)(6) dismissal of
plaintiff's claims under §1983 based on the suicide of her
husband. 220 F.3d 586, 2000 WL 960087 (5th Cir. June 14, 2000).
The Plaintiff in <u>Martin</u> called local emergency medical service
technicians for help with her husband, who was acting
disoriented, violent, and incoherent. <u>Id</u>. at *1. Before the
medical technicians arrived, two city police officers reached the
scene and contacted the local department of mental health, whose

staff advised the officers to either file charges or take the husband into protective custody. Id. The officers did not do either, and instead instructed the plaintiff and her son to leave the home. Id. Afterwards, the officers and EMS technicians also left the home, and when plaintiff returned the next day she discovered that her husband had committed suicide. Id. Plaintiff sued the two officers under §1983 for violation of her husband's due process rights under the Fourteenth Amendment under a theory of "state-created danger." Id. at *2. The Fifth Circuit affirmed dismissal of plaintiff's suit, finding that even if the "state-created danger" theory were applicable, the claim would only be viable if "the officers [knew] that [the husband] was suicidal before they can be viewed as having placed him in a position of danger." Id. Thus, because there was no evidence that the officers knew that leaving the husband alone in the house would create a danger of his suicide, plaintiff's claims failed as a matter of law. Id. Likewise, in this case, neither the officers involved in Ryshad's pursuit nor Champagne knew or even had any reason to know that Ryshad was suicidal and that the continued pursuit would cause him to drown himself. In fact, it would have been reasonable for the officers to think that their continued pursuit would eventually result in an end to Ryshad's flight and his return to the hospital for treatment. Thus, as in Martin, Plaintiff's claims against Champagne should be dismissed

as a matter of law.

Furthermore, even when police officers had prior knowledge of a person's suicidal tendencies, a "state-created danger" cause of action under §1983 based on that person's eventual suicide has failed as a matter of law. <u>Bynum v. City of Magee, Miss.</u>, 507 F. Supp. 2d 627, 634-35 (S.D. Miss. 2007). In <u>Bynum</u>, plaintiff brought claims against defendant city and state officers under §1983 for violation of his father's rights under the Fourteenth Amendment as a result of his father's suicide. <u>Id</u>. at 630-31. Plaintiff's father had been arrested while attempting suicide by laying in the middle of a busy highway, and again two days later after emergency calls from family members indicating that he had barricaded himself in a room and was threatening suicide. <u>Id</u>. at 631. Days after these two incidents, Bynum eventually did commit suicide by burning down his home while he was inside. <u>Id</u>. The <u>Bynum</u> court dismissed plaintiff's claims under a theory of state-created danger, finding that the defendants' actions did not increase the danger to the decedent in view of his pre-existing suicidal tendencies. <u>Id</u>. at 634. In sum, the <u>Bynum</u> court held that the "officers [] did not create [the risk of suicide] nor increase the danger either by picking up Mr. Bynum or by taking him to his home and leaving him there . . . [or, in other words] Bynum was no more vulnerable to suicide after his encounter with the officers than he was before that encounter." <u>Id</u>. In <u>Bynum</u>,

therefore, the "state-created danger" claims were dismissed against the state actors despite their clear prior knowledge of the decedent's risk of suicide. Likewise, in this case, in which the officers *had no knowledge whatsoever* of Ryshad's suicidal intent and did not take any actions to increase the risk of suicide, Champagne is entitled to judgment as a matter of law as to Plaintiff's claims under §1983. See also <u>Schoenfield v. City of Toledo</u>, 223 F. Supp. 2d 925, 930 (N.D. Ohio 2002) (denying §1983 action under theory of "state-created danger" based on suicide after brief detention by police because "[t]he harm to decedent, while perhaps identifiable by Defendants, was not created by Defendants").

Finally, in a remarkably similar case, the Middle District of Florida dismissed a wife's claims under §1983 for violations of her husband's 14th Amendment rights (among others) that resulted when he fled arrest and drowned in a retention pool as law enforcement officers looked on. <u>Purvis v. City of Orlando</u>, 273 F. Supp. 2d 1321 (M.D. Fla. 2003). The decedent in <u>Purvis</u> was arrested for drug possession at Orlando International Airport in a pre-arranged operation. <u>Id</u>. at 1323. Ahead of the planned arrest, the officers involved were informed that the decedent was possibly suicidal. <u>Id</u>. During the arrest, the decedent told police he had taken ten Xanax tablets and no longer wanted to live. <u>Id</u>. Eventually, the decedent, who had not been

handcuffed, fled police, scaled a fence, and entered a retention pond where he drowned. Id. While the decedent was in the pond, "[l]aw enforcement officials gathered at the shore of the pond, and a helicopter videotaped and illuminated Logan from above . . . [but] [a]lthough a boat was located nearby, [the officers] did not follow [the decedent] into the retention pond in order to rescue or capture him." Id. at 1324. Despite these facts, the Purvis court dismissed the plaintiff wife's claims, finding that the officers' actions were not deliberately indifferent. Id. The officers in Purvis were not liable under §1983 even in the stark circumstances of that case, and accordingly Champagne cannot be liable under the facts of this case.

In sum, Plaintiff has not met her burden of presenting facts to show that the qualified immunity defense is inapplicable.[4] As such, Champagne's motion should be granted.

**(2) Claims against Brogle**

Under the same law discussed above, Plaintiff's federal claims against Brogle should also be dismissed as a matter of qualified immunity and as a matter of fact. First, and based on

---

[4] The Court notes that Plaintiff's reply brief in opposition to Champagne's motion alleges that none of the pursuing officers made any attempt at all to stop Ryshad's flight, and that this complete failure at attempting to stop Ryshad constituted deliberate indifference. That allegation, however, is belied by the officers' deposition testimony and the summary judgment record, as discussed above, which indicate that the officers were actively trying to stop Ryshad's flight.

the summary judgment record before the Court, it is unclear how
the allegedly improper failure of Brogle's office to issue the
Commitment Order in any way affected Ryshad's eventual suicide.
Regardless of the issue of the timing of the request that the
parties have disputed in their briefs, the Court cannot discern
how the issuance of the requested Commitment Order would have at
all affected the pursuit and/or apprehension of Ryshad prior to
his drowning. Even if the Commitment Order had been issued
immediately upon Plaintiff's request, it would have been executed
by officers of the same sheriff's office that was *already in the
fruitless pursuit of Ryshad* at the Ashton Plantation. Thus, even
if Brogle's office had issued the Commitment Order, the record
evidence unequivocally reveals that the St. Charles Parish
sheriff's office was already engaged in the tragically vain
pursuit of Ryshad, and thus the Commitment Order would not have
changed the ultimate outcome.

Furthermore, and as argued by Brogle, Plaintiff's claims
against his office are internally inconsistent. Plaintiff argues
that Brogle violated Ryshad's Fourteenth Amendment rights to be
free from deprivation of life and liberty by *failing to deprive
him of liberty* via a Commitment Order. As was the case in the
claims against Champagne, this conundrum is precisely the catch-
22 that the rule of <u>DeShaney</u> intends to avoid. Thus, to the
extent that Plaintiff's claims against Brogle are inconsistent

with Deshaney, Brogle is entitled to judgment as a matter of law.

Finally, even if the claims against Brogle were factually viable, Brogle is entitled to qualified immunity as a matter of law. First of all, Brogle correctly notes that a commitment order would not have been properly issued under the operative Louisiana statutes governing involuntary commitment orders. Section 28:53.2 of the Louisiana Revised Statutes, which is substantially identical to the parallel provision in Article 1432 of the Louisiana Children's Code, requires a statement from "a peace officer or other credible person . . . specifying that, to the best of [the signatory's] knowledge and belief, the person [to be committed] is mentally ill or suffering from substance abuse and is in need of immediate treatment to protect the person or others from physical harm." La. Rev. Stat. Ann. §28:53.2(A); La. Child. Code. art. 1432(A). Plaintiff has not presented any evidence to show that such a statement was possible in the circumstances of this case, and in fact has testified to facts that would preclude the issuance of a commitment order under either provision. Specifically, Plaintiff's own deposition testimony reveals that Ryshad had no prior history of drug abuse or mental instability. Furthermore, the deposition testimony of the emergency room nurse Fontanelle also indicates that Ryshad was "calm and cooperative" prior to his flight from the hospital. Rec. Doc. 40-3, Ex. A, Deposition of Mark Fontanelle at 9. Based

on this testimony, it is unclear whether Plaintiff, Fontanelle,
or any other person could have issued a sworn statement that
Ryshad was mentally ill and/or suffering from substance abuse as
required under the relevant statutory provisions.

In addition, the decision of Brogle's office in refusing to
issue the Commitment Order was a discretionary function for which
qualified immunity would only fail if the refusal violated a
clearly established constitutional right as a matter of
objectively reasonable observations in the circumstances.  As
discussed above, the right to have one's liberty restrained as a
protective measure is not only unclear as a matter of
constitutional law, it is also severely undermined by the
DeShaney rule that state actors generally have no duty to protect
against private violence.  Furthermore, given the uncertainty as
to the availability of a commitment order under the governing
statutes in the circumstances of this case, Plaintiff has not
shown that Brogle's office acted in an objectively unreasonable
manner in refusing to issue the Commitment Order.  Thus, because
Plaintiff has not shown that the refusal to issue the Commitment
Order violated a clearly established constitutional right or that
Brogle's office acted in an objectively unreasonable manner in
refusing the order, Brogle's motion for summary judgment should
be granted.

**D.   Plaintiff's State Law Claims against Champagne & Brogle**

Based on the above analysis, the only remaining claims in this case are the tort claims under Louisiana law that are before this Court as a matter of supplemental jurisdiction. As a result, the Court finds tha t these claims should be dismissed under 28 U.S.C. §1367(c) without prejudice because all the federal claims over which this Court has original jurisdiction will be dismissed as a result of this order. Accordingly,

**IT IS ORDERED** that Champagne's **Motion to Dismiss, or in the Alternative Motion for Summary Judgment (Rec. Doc. 39)** is hereby **GRANTED.** Plaintiff's claims against Champagne under 42 U.S.C. § 1983 are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Brogle's **Motion for Summary Judgment (Rec. Doc. 40)** is hereby **GRANTED.** Plaintiff's claims against Brogle under 42 U.S.C. § 1983 are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's state law claims against Champagne and Brogle are hereby **DISMISSED WITHOUT PREJUDICE.**

New Orleans, Louisiana this _9th_ day of March, 2009.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE